IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 23, 2022

**DAMARKUS LOWE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 115287   Steven Wayne Sword, Judge**

——————————————————

**No. E2021-00492-CCA-R3-PC**

——————————————————

The Petitioner, Damarkus Lowe, appeals the denial of his petition for post-conviction relief from his first degree murder conviction, arguing that his trial counsel was ineffective for advising him not to testify in his own defense.  Based on our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which Robert W. WEDEMEYER and Timothy L. Easter, JJ., joined.

 J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Damarkus E. Lowe.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Petitioner and a co-defendant, Michael May, were indicted for the first degree premeditated murder of the victim, William Watson, and two counts of aggravated kidnapping based on alternate theories of the same offense against Myshauna Blair. Following a jury trial, the Petitioner was acquitted of the aggravated kidnapping counts but convicted of first degree premeditated murder and sentenced to life imprisonment.  His conviction was affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. *State v. Damarkus Lowe*, No. E2017-00435-CCA-

R3-CD, 2018 WL 3323757, at *1 (Tenn. Crim. App. July 6, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018).

Our direct appeal opinion reveals that the Petitioner's conviction stemmed from his participation with his co-defendant in the shooting death of the victim in Knoxville. On the afternoon of April 1, 2012, Ms. Blair was en route in her Buick automobile to pick up the Petitioner and Co-Defendant May from "Raider's Field," a Knoxville-area football field, when she collided with the victim in his Corvette. *Id.* at *2. Because she did not have a driver's license or insurance, Ms. Blair fled the scene. *Id.* at *3. The victim, however, followed her in his vehicle and pulled up beside her when she stopped at an intersection in the Raider's Field area. *Id.*

According to Ms. Blair's trial testimony, the victim, who was initially irate at the damage she had caused to his vehicle, had calmed down and was discussing the possibility of establishing a payment plan for her when the Petitioner, his co-defendant, and a third man, whom Ms. Blair knew as "Spruce," came running from the football field towards their location. *Id.* Both the Petitioner and Co-Defendant May were carrying guns. *Id.* When they reached their location, the Petitioner ran to the rear of the victim's vehicle, Co-Defendant May ran to the front of the victim's vehicle, and "Spruce," who was unarmed, got inside Ms. Blair's Buick. *Id.*

Ms. Blair testified that Co-Defendant May asked the victim what was going on. *Id.* She said that when the victim told him about the accident and said that they were going to have to pay him for the damage, Co-Defendant May opened fire, shooting at the victim three times through the victim's front windshield. *Id.* The Petitioner then started shooting at the victim through the back window. *Id.* Afterwards, the Petitioner and Co-Defendant May jumped into Ms. Blair's vehicle "and told her 'to pull off.'" *Id.* Ms. Blair testified that she was in shock and initially froze. *Id.* at *4. Co-Defendant May, however, "'put the gun' to her and ordered her to drive away" and she complied, dropping the men off at a Knoxville housing complex. *Id.* at *3-4.

According to Ms. Blair, the victim, who was unarmed, appeared frightened and about to flee when Co-Defendant May and the Petitioner opened fire. *Id.* at *3. Ms. Blair testified that she was so upset about the events that she broke down in tears later that night as she was relating what happened to her girlfriend at her girlfriend's workplace. *Id.*

In addition to Ms. Blair, the State also presented two other eyewitnesses to the shooting: Jonathan Borden and Mr. Borden's girlfriend, Angela Branch. *Id.* at *1-2. Mr. Borden described seeing two men in hoodies firing guns into the Corvette, with one of the men standing to the side of the vehicle and the other standing in front of the vehicle as they fired. *Id.* at *1. Ms. Branch described seeing the driver and a passenger of the Buick get

out of the Buick to argue with the victim before two African American men came running through the football field, joined the argument for a moment, and then opened fire at the victim. *Id.* According to Ms. Branch, one of the two shooters was positioned at the front of the Corvette and the other was positioned at the back when they began shooting. *Id.* On cross-examination, she acknowledged that she told the police in her initial statement that the driver of the Buick had been involved in the shooting but said she had been mistaken when she made that statement. *Id.*

Investigator A.J. Loeffler of the Violent Crimes Unit of the Knoxville Police Department testified that his investigation led him to Ms. Blair, who was cooperative and forthcoming with the police. *Id.* at *6. "Ms. Blair was the only witness who identified [Co-Defendant] May and the [Petitioner] from photographic lineups." *Id.* She was able to identify Co-Defendant May by his name but knew the Petitioner only by his street name of "D-Ru." *Id.*

Additional evidence presented by the State included: the Petitioner's recorded telephone calls from the jail, in which he appeared to acknowledge his guilt of the murder and that he was known by the street name of "D-Ru"; a packet of letters sent anonymously to the Knoxville Police Department that included letters purportedly authored by the Petitioner in which he referenced the victim's killing and discussed retaliation against Ms. Blair and her family; and cell phone records that showed that the Petitioner's and his co-defendant's cell phones were in communication at the time of the shooting, which corroborated Ms. Blair's trial testimony that Co-Defendant May had given her his cell phone so that he could call her on the Petitioner's cell phone to let her know when he wanted her to pick them up. *Id.* at *3-9.

In his defense, the Petitioner presented testimony by Ms. Blair, Ms. Blair's ex-girlfriend, and trial counsel's investigator. *Id.* at *9-10. The defense investigator, Michael Cohan, testified that Ms. Branch told him that the driver of the Buick and two other men who came through the fence were the ones involved in the shooting. *Id.* at *9. Ms. Blair, recalled as a witness for the defense, identified a photograph from her Facebook page that showed her holding two pistols but denied that either of those pistols were involved in the shooting. *Id.* at *10. Finally, Ms. Blair's ex-girlfriend, Kassandra Flood, refuted Ms. Blair's claim that she had tearfully related the account of the shooting to Ms. Flood at Ms. Flood's workplace on April 1, 2012. *Id.*

On April 12, 2019, the Petitioner filed a *pro se* petition for post-conviction relief in which he raised a number of claims, including ineffective assistance of counsel. Following the appointment of post-conviction counsel, he filed an amended petition in which he alleged that his trial counsel was deficient for, among other things, advising him not to testify in his own defense. The Petitioner alleged that, were it not for trial counsel's advice,

- 3 -

"he would have elected to testify on his own behalf, and that his testimony disputing the facts presented by the State perhaps may have created reasonable doubt about his guilt of first degree murder."

At the evidentiary hearing, the Petitioner testified that his trial counsel advised him not to testify but told him that the decision was the Petitioner's. The Petitioner stated that he was at first inclined not to testify but changed his mind after Ms. Blair's testimony, in which she lied about so many details of the crime. He said that he was present during the shooting but did not have a gun and never fired a shot. Instead, the two shooters were Co-Defendant May and the passenger in Ms. Blair's vehicle, who was Ms. Blair's cousin. The Petitioner testified that he expressed to trial counsel his desire to testify to correct Ms. Blair's lies, but trial counsel advised against it, telling him that it would hurt his case by placing him at the scene.

The Petitioner testified that he did not recognize the letters that the State introduced and that he had not authored any of them. When trial counsel showed him the letters before trial, he told trial counsel that he had not written them. He could not recall if he and trial counsel had any specific conversation about how his testimony might be essential to deny authorship of the letters.

On cross-examination, the Petitioner acknowledged that he was not surprised by Ms. Blair's trial testimony because she had identified him as one of the two shooters in her statements to the police and in her preliminary hearing testimony. He conceded that he was known by the nickname "D-Ru," which was the same name under which the letters were signed. He further conceded that, had he testified at trial, the State could have cross-examined him not only about the content of his phone calls from the jail, but also, in order to corroborate the State's position that he had authored the letters, about his regular mail correspondence and his jail visits with two of the women addressed in the letters.

Trial counsel testified that he began his representation of the Petitioner after the Petitioner's initial trial counsel, who had represented the Petitioner in general sessions court and through his arraignment in criminal court, had been allowed to withdraw from representation. He said he received discovery from the State, which he shared and reviewed with the Petitioner. Based on that discovery and Ms. Blair's preliminary hearing testimony, he was aware that Ms. Blair had provided a lengthy statement to the police in which she had identified the Petitioner as one of the two shooters. He was also able to review with the Petitioner well in advance of trial the letters that the State introduced at trial. Trial counsel was unsuccessful, both at trial and on appeal, in his attempts to have the letters ruled inadmissible.

Trial counsel testified that he advised the Petitioner not to testify at trial but made it clear that it was ultimately his decision. He explained that his advice was based on the prosecutor's skill at cross-examination and the fact that the Petitioner would have been cross-examined on the damaging and prejudicial letters and phone calls. He acknowledged that the Petitioner could have explained his telephone calls and refuted his authorship of the letters but expressed doubt that it would have helped his case, testifying that he did not think the Petitioner had any good explanation for the phone calls or letters. Trial counsel recalled that the Petitioner at one point in the *Momon* hearing expressed a desire to testify. He said the trial court ordered a recess so that trial counsel and the Petitioner could discuss the issue further. During that recess, trial counsel again advised the Petitioner not to testify based on the same reasons he had earlier expressed.

On cross-examination, trial counsel acknowledged that the State presented proof of the Petitioner's authorship of the letters through evidence that the Petitioner had sent mail on multiple occasions to one of the women addressed in the packet of letters, including on a date that corresponded to the date of one of the letters, and had been visited at the jail by another woman, whose visit was referenced in the letters. Trial counsel agreed that the Petitioner was a very young man at the time of trial and would likely not have fared well under any kind of cross-examination, much less a cross-examination on "the damaging and descriptive phrases" in the phone calls and letters, which contained the Petitioner's apparent acknowledgment of his guilt and descriptive language about exacting revenge on Ms. Blair and her family for her cooperation with the police.

Trial counsel testified that the Petitioner was at one time offered a plea bargain of twenty-five years for second degree murder. Based on his records, the Petitioner was subsequently offered additional plea bargains that were contingent upon the Petitioner's testifying truthfully against his co-defendant, who was the main focus of the police investigation. Trial counsel recalled that the evidence at trial showed that the gunshots that killed the victim were all fired from the front of the vehicle, and he agreed that his defense theory was that the Petitioner was not criminally responsible for the actions of his co-defendant.

On April 9, 2021, the post-conviction court entered an order denying the petition. Among other things, the court found that trial counsel's advice against testifying was reasonable based on the facts and circumstances of the case, which included the Petitioner's youth and lack of experience, the prosecutor's skill at cross-examination, the Petitioner's inability to offer an adequate response to "pieces of damning evidence," and the defense strategy of attempting to blame the co-defendant for the murder. The court further found that the Petitioner failed to show how his testimony at trial would have resulted in a different outcome in his case. Accordingly, the court concluded that the Petitioner failed

to meet his burden of demonstrating by clear and convincing evidence either a deficiency in counsel's performance or any resulting prejudice to his case.

## ANALYSIS

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Id.* However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

On appeal, the Petitioner contends that the post-conviction court erred in finding that trial counsel's advice against testifying was based on a reasonable trial strategy. The Petitioner asserts that his own testimony was necessarily critical, as he was the only available witness who could have explained the phone calls, refuted the State's claim that he authored the letters, and presented testimony that he was not the second shooter.

The record, however, fully supports the findings and conclusions of the post-conviction court. Trial counsel offered a reasonable basis for his advice that the Petitioner not testify, explaining his belief that the young and inexperienced Petitioner, who had no good answers to the damaging statements in the phone calls and letters, would not have fared well under cross-examination by the talented prosecutor. Trial counsel also reasonably believed that the Petitioner's testimony, which would have placed the Petitioner at the scene, would have hurt the Petitioner's case because only a single eyewitness had identified the Petitioner as one of the gunmen. The Petitioner has failed to show that trial counsel was deficient in his performance, or that he was prejudiced as the result of any alleged deficiency on the part of counsel. As such, the Petitioner is not entitled to post-conviction relief.

## CONCLUSION

Based on our review of the record, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
JOHN W. CAMPBELL, SR., JUDGE